O'NEIL LUMBER COMPANY, Plaintiff,

v.

ALLIED BUILDERS CORPORATION, Defendant-Third Party Plaintiff-Respondent,

v.

PIONEER NATIONAL TITLE INSURANCE COMPANY, Third Party Defendant-Appellant.

No. 46503.

Missouri Court of Appeals, Eastern District, Division Four.

Nov. 29, 1983.

Motion For Rehearing and/or Transfer to Supreme Court Denied Jan. 12, 1984.

Application to Transfer Denied Feb. 15, 1984.

Lawrence J. Permuter, St. Louis, for Pioneer Nat. Title Ins.

John A. Walsh, St. Louis, for Allied Builders.

Arthur L. Poger, St. Louis, for intervening appellant.

SMITH, Judge.

Defendant Pioneer National Title Insurance Company [1] appeals from a judgment against it for $18,612.79 in a jury tried contract case. We affirm.

In September 1974 four parties entered into a construction and disbursing escrow agreement. Allied was the general contractor for work to be done at "The Barn at Lucerne" in St. Louis County; Gateway West Investments, represented by Paul Londe, was the owner of the project; Pioneer Bank and Trust Company was the mortgagee; defendant (unrelated to the bank) was the escrowee. The contract provided for money to be deposited with the escrowee "for use in payment for labor, materials, services, and all other items included in [a] Schedule, all relating to the property described below and the construction of improvements thereon . . . ."

In the contract plaintiff undertook to fully construct and complete the improvements to the project by March 12, 1976. It further agreed:

"To execute payment requisitions or Escrowee's vouchers authorizing payments for labor, materials and services and to deliver to Escrowee paid bills and mechanic's and materialmen's lien waivers from those receiving payment . . . .

"To request payment of no portion of his profit until all costs of construction of improvements have been paid in full and the improvements have been accepted by Owner."

The escrowee, which was paid for its services as such, agreed "[t]hat it will accept and use due care in disbursing funds in accordance with the terms of this agreement . . . ."

The contract also provided that Escrowee "at its election, may make payments directly for any item required to be paid hereunder without first securing approval of Owner and/or Contractor."

Defendant provided plaintiff with a group of blank vouchers to use. When plaintiff wanted money disbursed it would fill out a voucher indicating the recipient and amount and would send it to Mr. Londe. He in turn would forward the voucher to defendant which would sign the negotiable voucher and send it to the person or entity entitled to the payment. Unless the payment was to plaintiff, it would have

---

1. Pioneer was actually a third party defendant. The base litigation between O'Neil Lumber Company, plaintiff and Allied Builders Corporation, defendant-third party plaintiff, was disposed of by consent judgment for O'Neil. We will designate Allied as plaintiff and Pioneer as defendant.

no knowledge of disbursement of funds after it had prepared the voucher and forwarded it to Londe. In addition plaintiff prepared and submitted directly to defendant monthly reports on money expended to date, amounts still available in each of the various categories of work and similar information. There was testimony that copies of the original vouchers were sent directly to defendant, although the testimony was equivocal. In July 1975, when the work was virtually complete, plaintiff sent to defendant copies of the "revised vouchers ... as well as a recap of all the money owed to the sub-contractors, suppliers, and ourselves, per Mr. Londe's request." These documents reflected that Londe was holding earlier vouchers for payment to O'Neil Lumber Company of $7191.83 and that there was also owing to that company $1135.96 as a final payment. Also attached were copies of vouchers for O'Neil reflecting the original vouchers being held by Londe. There were additionally recap sheets of the entire project, summaries of amounts paid, and a list of amounts still owing to the contractor, sub-contractors, and materialmen.

In September 1975 plaintiff executed an affidavit which certified that all sub-contractors and materialmen had been paid. This affidavit was necessary for the plaintiff to receive its final payment on the project. At the time of executing the affidavit plaintiff knew that all vouchers for material had been submitted to Londe and copies had been furnished defendant; plaintiff assumed those vouchers had been paid by defendant.

In January 1976 O'Neil notified plaintiff that $7503.79 was due and owing to it for materials furnished on the project. Plaintiff immediately contacted defendant which contended it had never received original vouchers for the amount owing. It did, however, have documents previously furnished by plaintiff which showed the amounts owing to O'Neil. The amount due O'Neil was exactly the amount shown on the July 1975 recap as owing to O'Neil less a bill of $824 shown on the recap as one of the two final payments due. Defendant

advised plaintiff that the O'Neil claim had not been paid but that there was money in escrow to pay it. Subsequently, it was agreed between defendant and Londe that the amount to cover the O'Neil claim would not be continued in escrow and that Londe would indemnify defendant for that claim.

O'Neil sued plaintiff on its claim and plaintiff filed its third party petition against defendant. The claim of O'Neil resulted in a consent judgment between it and plaintiff for the full amount of the claim plus interest at the rate of 1.5% per month or a total judgment of $17,675.29. Plaintiff expended $937.50 in attorney's fees in defending against the O'Neil claim. At trial the jury awarded plaintiff the amount of the consent judgment plus the attorney's fees.

On appeal defendant raises essentially two contentions. The first is leveled against the submissibility of plaintiff's case and as a challenge to the verdict-directing instruction. The thrust of that contention is that plaintiff did not establish or submit to the jury its compliance with the contract. This in turn is premised upon evidence that plaintiff asked for and received its final payment including profits before all costs of construction had been paid and that it failed to execute and deliver to defendant original negotiable vouchers authorizing payment to O'Neil.

 It is clear that plaintiff submitted its bills during the progress of the work and these bills included plaintiff's profits. Defendant paid these bills including the profits. The request for profits was contrary to the language of the contract. But this technical breach by plaintiff in no way affects the obligations of defendant under the contract nor its liability to plaintiff for its failure to pay O'Neil. This was not a condition precedent to defendant's performance under the contract as defendant contends. A "condition precedent" is one that is to be performed before the agreement becomes obligatory, and which calls for the happening of some event or the performance of some act (after the terms of the contract

have been agreed on) before some act dependent thereon must be performed. Black's Law Dictionary, Fifth Edition; *Juengel Construction Co., Inc. v. Mt. Etna, Inc.,* 622 S.W.2d 510 (Mo.App.1981) [1, 2]. Defendant's function under the contract was to provide the mortgage holder with protection of its security for the loan. As such it undertook to disburse funds to all subcontractors and materialmen as well as the general contractor. This was to enable it to assure that the project when completed would be free from liens and claims which might jeopardize the bank's security. It defies logic to conclude that a mere premature request for profits by plaintiff absolved defendant from all other obligations under the escrow agreement.

■■■ In addition, if there was a breach by plaintiff in requesting profits it was acquiesced in by defendant which had the obligation to refuse payment of unauthorized requests for funds.[2] Finally, the evidence does not support a conclusion that this breach was in any way detrimental to defendant. The only evidence is that at the time it became aware of the O'Neil claim, defendant had available escrow funds to meet that claim. It produced no evidence to the contrary nor did it at any time seek restitution from plaintiff as was authorized under the contract, premise its refusal to pay O'Neil upon the disbursement of profits to plaintiff, or contend that its failure to pay O'Neil was caused by its payments to plaintiff. It offered no evidence that the project was over budget and in fact the only evidence is that it was under budget. Plaintiff's technical breach afforded no defense to defendant and the fact it existed did not prevent plaintiff

from making a submissible case or require utilization of an instruction other than MAI 26.02.[3]

■■■ The contract did not require plaintiff to submit original negotiable vouchers to defendant to trigger defendant's obligation to disburse funds as defendant now asserts. It required "payment requisitions" or "vouchers." Neither term was defined. The documents submitted by plaintiff directly to defendant certainly met the requirements for payment requisitions or vouchers. They gave full information on the person owed, the amount owed, and the service rendered or the material furnished. The thrust of defendant's position regarding the vouchers is that it occupied the role of a scrivener, whose only obligation was to countersign vouchers and send them to those persons named thereon. Its obligations under the contract were considerably more than that. It was required to use due care in the disbursement of funds, it was authorized to make payments whether requested or not by the owner or general contractor, and its major function was to handle the money for the project so that no liens against the property could be asserted which would endanger the security of the lending bank. It was paid for that service. The O'Neil claim clearly appeared in the documents furnished to defendant by plaintiff and even the most rudimentary examination of them would have made apparent the debt owed. It was defendant's obligation to pay that debt. In addition the debt was specifically called to defendant's attention when it still had money available to satisfy the debt. Plaintiff supplied all of the information necessary for defendant to

2. The contract did not prevent plaintiff from receiving its final payment (other than profits) prior to payment of other construction costs. To the extent defendant's point is based upon receipt of final payment by plaintiff after the September affidavit, it is clear that defendant had the information that O'Neil had not been paid. Plaintiff had submitted all the information required of it (see *infra*) and had no knowledge that the vouchers it had submitted were unpaid. Plaintiff's ignorance that defendant had failed to carry out its obligations can provide no defense for defendant.

3. The trial court gave, at defendant's request, an affirmative defense instruction which called for a defendant's verdict if the jury found plaintiff received profits contrary to the contract. Defendant points to this instruction as evidence that the trial court viewed this breach as a defeasance of plaintiff's claim. For the reasons we have heretofore stated it was error to give the instruction; an error of which defendant is in no position to complain.

disburse the money owed to O'Neil if defendant had used even a modicum of due care in fulfilling its obligations under the contract. There was no breach of the "voucher" requirement by plaintiff and defendant's contentions regarding submissibility of the case and instructional error in this regard are without merit.

We find no basis for concluding that defendant was relieved of liability for its nonperformance because of anything done by plaintiff. The evidence was sufficient to establish plaintiff's case, and the failure of the verdict-directing instruction (MAI 26.-02) to hypothesize these alleged breaches by plaintiff did not constitute error. Those matters were irrelevant to plaintiff's right to recover.

 Defendant's second contention is that the court erred in utilizing MAI 4.09 modified because the instruction did not allow the jury to assess a lesser amount of damages than the consent judgment and did authorize the jury to award attorney's fees. There was no issue of the amount of the consent judgment and no evidence or contention that the amount of that judgment was excessive. Defendant's contention is based on evidence it adduced that on March 31, 1978, it disbursed the remaining amount left in the escrow account to Gateway and that amount was $2920.17. The witness who testified to that fact also admitted that earlier disbursements to Gateway could have been made and gave no testimony of the amount of money in escrow in January 1976 when the O'Neil claim became known. Assuming for present purposes that inadequacy of the escrow funds in January 1976 might limit defendant's liability to the amount available at that time, defendant has no evidence of such a shortage when its obligation to pay O'Neil in 1975 and 1976 became known. Evidence of a shortage 26 months after O'Neil made a claim is not evidence of shortage when the claim was made. This is particularly true when defendant's evidence established that the state of the escrow in 1978 was not necessarily, or even probably, its state in January 1976. There was no basis for an instruction authorizing damages of an amount other than the amount of the consent judgment. MAI 4.09 is designed for a case where the damages are legally undisputed and it was properly utilized here. MAI 4.09 Notes on Use.

 Defendant asserts attorney's fees are not recoverable in the absence of statute or contract so providing. Generally that is true. *Estate of Zeppenfeld,* 593 S.W.2d 890 (Mo.App.1979) [8–10]. There is, however, an exception where a breach by defendant causes expenditure of attorney's fees by plaintiff in collateral litigation. *Forsythe v. Starnes,* 554 S.W.2d 100 (Mo. App.1977). The suit by O'Neil against plaintiff was collateral to plaintiff's action against defendant albeit both claims were asserted procedurally in the same case. The three-pronged test of recovery set forth in *Forsythe v. Starnes* [21, 22], *supra,* is met here. There is no question raised that the fees were reasonable. The O'Neil litigation was the natural and proximate result of the breach of duty by defendant. Plaintiff incurred the fees in defending against the O'Neil claim in good faith to protect itself from injury. It is true, as defendant asserts, that plaintiff could have simply paid O'Neil and sought indemnity against defendant. But in the absence of the consent judgment both its liability and the amount of the debt owed would have been subject to challenge in its litigation with defendant. There is no evidence that the defense was anything but a good faith attempt by plaintiff to protect itself from an injury threatened by defendant's breach of its obligations under the contract. The jury was properly instructed that it could award attorney's fees for that defense and we find no reason to second-guess its judgment.

Judgment affirmed.

GAERTNER, P.J., STEPHAN, J., concur.